**Gloria PERSONHUBALLAH, et al., Plaintiffs,**

v.

**James B. ALCORN, et al., Defendants.**

**Civil No. 3:13–cv–678**

United States District Court,
E.D. Virginia,
**Richmond Division.**

Signed 03/03/2017

John M. Devaney, Esquire, Kevin Hamilton, Esquire, John K. Roche, Esquire, Perkins Coie LLP, Seattle, WA, Attorneys for Plaintiffs.

Stuart A. Raphael, Esquire, Trevor S. Cox, Esquire, Office of the Attorney Gen-

eral, Richmond, VA, Attorneys for Defendants.

Jonathan A. Berry, Esquire, Michael A. Carvin, Esquire, Mark R. Lentz, Esquire, Jones Day, Washington, DC, Attorneys for Intervenor–Defendants.

Before DIAZ, Circuit Judge, O'GRADY, District Judge, and PAYNE, Senior District Judge.

## MEMORANDUM OPINION AND ORDER

O'GRADY, District Judge:

This matter comes before the court on Plaintiffs' Fourth Supplemental Motion for Attorney's Fees. Plaintiffs prevailed at trial, on remand, and before the United States Supreme Court on their claim that Virginia's Third Congressional District, as drawn in the 2012 congressional redistricting plan, constituted a racial gerrymander in violation of the Equal Protection Clause of the Fourteenth Amendment. As the prevailing party, Plaintiffs are entitled to costs and attorney's fees. We awarded Plaintiffs $779,189.39 following the first entry of judgment, but stayed our final order on that motion. Plaintiffs now ask the court to reinstate the earlier fee award of $779,189.39 and to enter an additional award of $718,189.25 against Defendants and Intervenor–Defendants. For the reasons that follow, Plaintiffs' motion is granted in part and denied in part.

## I. BACKGROUND [1]

Plaintiffs sued the Chairman, Vice–Chair, and Secretary of the Virginia State Board of Elections challenging the constitutionality of Virginia's Third Congressional District as drawn by the General Assembly in its 2012 districting plan.[2] Plaintiffs sought declaratory relief and a permanent injunction enjoining the Commonwealth from holding elections under the 2012 plan. Soon after the complaint was filed, Virginia Congressmen Eric Cantor, Robert J. Wittman, Bob Goodlatte, Frank Wolf, Randy J. Forbes, Morgan Griffith, Scott Rigell, and Robert Hurt intervened as defendants. Their entry into the litigation was unopposed by Plaintiffs and the named Defendants.

Following a bench trial, we held that the Third Congressional District was an unconstitutional racial gerrymander in violation of the Fourteenth Amendment's Equal Protection Clause and thereafter enjoined the Commonwealth "from conducting any elections subsequent to 2014 for the office of United States Representative until a new redistricting plan is adopted." As the prevailing party, Plaintiffs timely moved for fees and costs pursuant to 42 U.S.C. § 1988 and 52 U.S.C. § 10310(e). We entered an award of $779,189.39 against Defendants, but granted Defendants' request to stay enforcement during the pendency of the appeals process.

Intervenor–Defendants appealed to the Supreme Court. Defendants did not join in

1. The history of this litigation has been documented on numerous prior occasions. *See, e.g., Personhuballah v. Alcorn*, 155 F.Supp.3d 552 (E.D. Va. 2016); *Page v. Va. State Bd. of Elections*, No. 3:13-cv-678, 2015 WL 3604029 (E.D. Va. June 5, 2015), *appeal dismissed sub nom. Wittman v. Personhuballah*, —— U.S. ——, 136 S.Ct. 1732, 195 L.Ed.2d 37 (2016); *Page v. Va. State Bd. of Elections*, 58 F.Supp.3d 533 (E.D. Va. 2014), *vacated sub nom. Cantor v. Personhuballah*, —— U.S. ——,

135 S.Ct. 1699, 191 L.Ed.2d 671 (2015). We incorporate those earlier recitals here and set out only those facts relevant to the pending fee petition.

2. The Virginia State Board of Elections and the Attorney General of Virginia were also named as defendants, but they were dismissed early in the litigation. (Dkt. No. 14).

the appeal, taking the position that Intervenors could not prevail under the deferential standard of review governing factual findings. The Supreme Court vacated the judgment and remanded to us for further consideration in light of *Alabama Legislative Black Caucus v. Alabama,* —— U.S. ——, 135 S.Ct. 1257, 191 L.Ed.2d 314 (2015).

Following the remand order, Virginia Representatives Barbara Comstock and David Brat moved to intervene as defendants. Plaintiffs opposed the motion on the ground that Representatives Comstock and Brat, and indeed all Intervenor–Defendants, lacked standing following Defendants' decision to no longer defend the plan. We granted the motion over Plaintiffs' opposition.

Pursuant to the Supreme Court's instruction, we ordered all parties to submit briefing on the effect of *Alabama.* While Intervenor–Defendants took the position that *Alabama* "unequivocally confirm[ed]" the error in our first decision, Defendants aligned with Plaintiffs, arguing that *"Alabama* confirmed the legal grounds on which the Court based its decision." On reconsideration, we again concluded that the Third Congressional District was unconstitutional and again enjoined the Commonwealth from conducting elections "until a new redistricting plan [was] adopted."

Thereafter, Plaintiffs filed a third supplemental motion for attorney's fees, seeking an award of $73,540.50 against Defendants and Intervenor–Defendants for the fees incurred on remand. Because Intervenor–Defendants had again appealed to the Supreme Court, we denied the motion without prejudice pending the outcome of the appeal. As before, Defendants did not join in the appeal and filed a brief taking the position that the Court should affirm.

While the merits appeal was pending before the Supreme Court, we turned to the unwelcome task of fashioning a remedial redistricting plan. We instructed all parties and all interested nonparties to submit proposed remedial plans. Plaintiffs and Intervenor–Defendants submitted plans for consideration. Defendants did not. To assist in crafting a remedy, we appointed Dr. Bernard Grofman to serve as special master. Following a round of briefing and a hearing, we adopted one of Dr. Grofman's recommended plans—what became known as Congressional Plan Modification 16. Over Intervenor–Defendants' objection, we declined to stay implementation of the remedial plan pending resolution of the merits appeal before the Supreme Court. Intervenor–Defendants' effort to obtain a stay from the Supreme Court was also unsuccessful. *Wittman v. Personhuballah,* —— U.S. ——, 136 S.Ct. 998, 194 L.Ed.2d 16 (2016).

In a unanimous decision, the Supreme Court ruled that Intervenor–Defendants were without standing and dismissed the second merits appeal. Following the mandate, Plaintiffs timely filed a fourth supplemental fee petition, to which we now turn.

## II. DISCUSSION

Plaintiffs ask the court to do three things. First, Plaintiffs ask that we reinstate the fee award of $779,189.39 entered after the first entry of judgment in their favor. Second, Plaintiffs renew their third supplemental motion for $73,540.50 in fees incurred on remand. Finally, Plaintiffs request a final supplemental award of $644,648.75 corresponding to their work performed during both the remedial phase of the litigation and the second appeal to the Supreme Court. In response, Defendants and Intervenor–Defendants challenge the reasonableness of the fees requested and dispute the allocation, if any, of the fee award between them.

We begin by addressing the issue of intervenor fee liability. Next, we set forth the general legal framework for fee awards. We then grant Plaintiffs' unopposed request to reinstate the first fee award. Finally, we address the specific objections raised by Defendants and Intervenor–Defendants to the reasonableness of the fees sought by Plaintiffs in their third and fourth supplemental petitions. After considering these arguments, evaluating the reasonableness of each fee petition, and calculating Plaintiffs' costs, we conclude by finding that Plaintiffs are entitled to a total award of $1,346,571.74.

## A. Intervenor Fee Liability

This case raises an issue of first impression in this Circuit. Namely, under what circumstances can an intervenor be held liable for a plaintiffs attorney's fees under 42 U.S.C. § 1988? The answer turns on whether this case is controlled by *Independent Federation of Flight Attendants v. Zipes*, 491 U.S. 754, 109 S.Ct. 2732, 105 L.Ed.2d 639 (1989), or whether it is instead guided by the cases that have distinguished *Zipes* in the 27 years since it was decided. After reviewing the relevant caselaw, we agree with the reasoning of the Third, Seventh, and Eleventh Circuits, which have all distinguished *Zipes* on similar facts. As such, we hold that Intervenors are liable for attorney's fees incurred after April 13, 2015, the date on which Defendants formally abandoned their defense of Virginia's Third Congressional District and left Intervenors as the only functional defendants in the case. *See generally* Defs.' Opening Br. Regarding the Legal Effect *of Alabama Legislative Black Caucus v. Alabama* at 3, Dkt. No. 145.

### 1. *Zipes* and Subsequent Caselaw

*Zipes* was a case in which female flight attendants of Trans World Airlines filed a class action against the airline alleging sex discrimination in violation of Title VII of the Civil Rights Act of 1964. Nearly a decade after the suit commenced, the parties entered into a settlement agreement. After the settlement, a union, the Independent Federation of Flight Attendants, intervened to oppose the settlement and defend the seniority rights of flight attendants affected by the agreement but who were not members of the class. The plaintiffs ultimately prevailed against the union's challenge in the Supreme Court and sought to recover fees from the union under Title VII's fee-shifting provision.[3] The Seventh Circuit affirmed the district court's award of fees against intervenors, but the Supreme Court reversed.

The majority supported its decision by reasoning that intervenors had not violated anyone's civil rights and they therefore should not be liable for the related attorney's fees unless the "intervenors' action was frivolous, unreasonable, or without foundation." *Zipes*, 491 U.S. at 761, 109 S.Ct. 2732. In other words, the Court emphasized that "liability on the merits and responsibility for fees go hand in hand." *Id.* at 763, 109 S.Ct. 2732 (quoting *Kentucky v. Graham*, 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985)). Relatedly, it found that "[a]ssessing fees against blameless intervenors . . . is not essential"

---

**3.** The fee statute relied upon in *Zipes*, 42 U.S.C. § 2000e–5(k), is not at issue here. Nonetheless, *Zipes* explained "that fee-shifting statutes' similar language is a strong indication that they are to be interpreted alike." *Zipes*, 491 U.S. at 758 n.2, 109 S.Ct. 2732. Though this may be true, it does not account for the fact that Title VII claims will often arise in different contexts from the constitutional claims upon which § 1988 fee awards are predicated. The difference in statutes does not distinguish *Zipes* on its own, but it does highlight that § 1983 suits challenging electoral districts may have a different factual character than claims brought under Title VII.

to fulfilling the statute's aim. *Id.* at 761, 109 S.Ct. 2732. The Court further noted that the negative effects on plaintiffs would be minimal because, "[i]n every lawsuit in which there is a prevailing Title VII plaintiff there will also be a losing defendant who has committed a legal wrong." *Id.*

In explaining its decision, the Court relied heavily on the legal framework underlying Title VII class action settlements and their potential to cause third-party harm. The Court wrote: "The *central fact* remains that petitioner litigated (and lost) not to avoid liability for violation of the law but to prevent TWA's bargaining away of its members' seniority rights in order to settle with respondents." *Id.* at 765–66, 109 S.Ct. 2732 (emphasis added). The opinion further noted that "[a]n intervenor of the sort before us here is particularly welcome, since we have stressed the necessity of protecting, in Title VII litigation, 'the legitimate expectations of ... employees innocent of any wrongdoing." *Id.* at 764, 109 S.Ct. 2732. Indeed, the Court highlighted that, in the context of complex civil rights litigation, interveners like the union in *Zipes* are encouraged because their participation in the lawsuit eliminates the piecemeal litigation that can arise from collateral attacks on Title VII settlements. *Id.* at 764, 109 S.Ct. 2732 (citing *Martin v. Wilks*, 490 U.S. 755, 768, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989)).

In summary, the *Zipes* majority emphasized four key factors in its decision: (1) the "blamelessness" of an intervenor that did not violate any law and is not liable on the merits for the harms for which plaintiffs brought suit; (2) the fact that plaintiffs would be compensated by fees assessed against defendants; (3) the importance of protecting third-party interests in Title VII settlements; and (4) the

considerations of judicial economy that counsel against piecemeal attacks on settlement agreements. Based on these factors, the Court held that the fee liability of "innocent" and "blameless" intervenors would be governed by the same standard applicable to losing civil rights plaintiffs. *Id.* at 760, 109 S.Ct. 2732 (citing *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978)). That is, "district courts should ... award ... attorney's fees against losing intervenors only where the intervenors' action was frivolous, unreasonable, or without foundation." *Id.*

The case was decided by an eight-member court, with five justices joining the majority opinion without reservation.[4] Justice Blackmun filed a concurrence in which he criticized the majority for "presumptively ... plac[ing] the additional cost of litigating third-party rights on the prevailing Title VII plaintiff, whom Congress has assumed lacks the resources to bear them." *Id.* at 767, 109 S.Ct. 2732 (Blackmun, J., concurring). Nonetheless, he concurred in the result with the understanding that plaintiffs might be able to collect fees from defendants if they could not prevail under the *Christianburg* standard set out by the majority.

Justice Marshall, joined by Justice Brennan, dissented. The dissent argued that the majority's adoption of "a blanket rule" failed to distinguish between different types of intervenors. *Id.* at 775, 109 S.Ct. 2732 (Marshall, J., dissenting). Justice Marshall agreed that applying the standard announced by the Court could be appropriate in some circumstances, but saw "absolutely no justification for it where ... an intervenor asserts non-civil-rights claims of third parties, or where an intervenor raises no third-party claims at

---

4. Justice Stevens did not participate.

all." *Id.* Therefore, in addition to disagreeing with the concept of "blameworthiness" that supported the majority's decision, Justice Marshall's dissent also highlighted the potential of the *Zipes* ruling to reach far beyond the facts of that case.[5]

Courts interpreting *Zipes*, however, have delineated some outer boundaries of the *Zipes* decision. The Third Circuit considered a question very similar to the case at bar in *Planned Parenthood of Central New Jersey v. Attorney General*, 297 F.3d 253 (3d Cir. 2002). There, the court held intervenor-defendants liable for fees where the state-official defendants declined to defend the constitutionality of New Jersey's Partial–Birth Abortion Ban from the outset. Planned Parenthood and several physicians challenged the constitutionality of the ban by suing the Attorney General, the New Jersey Board of Medical Examiners, and the Commissioner of the Department of Health and Senior Services. The named defendants declined to defend the statute. Shortly after the complaint was filed, the New Jersey Legislature intervened with the intent "to vigorously defend the constitutionality of the Act." *Id.* at 258.

After plaintiffs prevailed, the Third Circuit affirmed an award of fees against the intervenor-defendants. The court distinguished *Zipes*, characterizing it as "focused on interveners who entered the suit to protect the interests of a third-party and a suit in which there was another defendant who would be held liable for the fees." *Id.* at 263. The court noted that *Zipes* dealt with two distinct disputes: the battle between plaintiffs and defendants, and the separate battle between plaintiffs

and intervenors regarding the appropriateness of the settlement. *Id.* at 264. According to the Court, this stood in contrast with the facts of *Planned Parenthood*, where intervenors' legal interests were perfectly aligned with those of the original defendants. *Id.* Put simply, "when a legislature feels it necessary to perform what is generally regarded as an executive function because the state executive branch officials named as defendants in their official capacities refuse to perform that function, the legislature is the functional equivalent of a defendant in the case—without it, there would be no case." *Id.*

In support of this distinction, the court adopted the reasoning of various district court opinions. *See Mallory v. Harkness*, 923 F.Supp. 1546, 1553 (S.D. Fla. 1996), *aff'd*, 109 F.3d 771 (11th Cir. 1997); *Daggett v. Kimmelman*, Civ. Nos. 82-297, 1989 WL 120742 at *7 (D.N.J. July 18, 1989); *May v. Cooperman*, 578 F.Supp. 1308 (D.N.J. 1984). In *Daggett*, the district court assessed fees against intervenors in the context of an unconstitutional redistricting plan analogous to the case at hand. The Third Circuit approvingly quoted the district judge in *Daggett* at length:

I have serious doubts about the applicability of *Zipes* .... In *Zipes*, the Supreme Court reasoned that the intervenors were completely "blameless," having had no part in the constitutional violation of which plaintiffs complained, and intervened only to protect their own rights which were affected by a proposed settlement agreement between plaintiffs and defendants.

---

5. In the years since *Zipes* was decided, courts have interpreted its holding with varying levels of breadth. Quoting the opinion's sweeping language, the Ninth Circuit invariably has affirmed that "fee awards should be made against losing interveners 'only where the intervenors' action was frivolous, unreasonable,

or without foundation.'" *Democratic Party of Washington v. Reed*, 388 F.3d 1281 (9th Cir. 2004) (quoting *Zipes*, 491 U.S. at 761, 109 S.Ct. 2732). As discussed below, however, other circuits have distinguished *Zipes* on facts similar to those underlying this case.

938

Moreover, the Court reasoned that there were present in the action "guilty" defendants, who would be liable, in any event, for the counsel fees and costs incurred by plaintiffs. I question the defendants-intervenors' qualifications as "blameless" intervenors, in light of the vigorous battle fought defending an unconstitutional statute, and, in addition, cannot ignore the absence in this case of the "guilty" defendant who otherwise would be liable for these fees.

*Planned Parenthood*, 297 F.3d at 263–64 (quoting *Daggett*, 1989 WL 120742, at *7 n.6) (citations omitted).

The Third Circuit also quoted at length from the district court in *Mallory*. *Id.* at 264 (quoting *Mallory*, 923 F.Supp. at 1553). In *Mallory*, the Plaintiff brought suit against executive members of the Florida Bar and the Florida Bar Board of Governors, seeking to invalidate a Florida statute requiring that one-third of Florida's Judicial Nominating Commission be comprised of either women or members of a racial or ethnic minority group. When the original defendants declined to defend the challenged statute, the Florida Attorney General and the National Bar Association intervened. After finding that the statutory quota violated the Equal Protection Clause of the Fourteenth Amendment, the Court apportioned Plaintiff attorney's fees between intervenors and defendants under § 1988.

The *Mallory* court found that intervenors were not "blameless" because they "willingly enforced the unconstitutional statute, thus directly violating the Plaintiffs civil rights." *Id.* at 1552. The court distinguished *Zipes* because, in contrast to the union intervenor there, the AG-intervenor in *Mallory* had no legal interest apart from the enforcement of the statute and, "in fact, acted as the defendant in

[the] case." *Id.* at 1553. In support of its decision, the court explained:

> The state should not be allowed to require the Florida Bar to enforce an unconstitutional statute, *defend that statute on the merits as an intervenor* in federal court, and then attempt to use its intervenor status to escape liability for attorney's fees. Allowing such a loophole violates the policy behind 42 U.S.C. § 1988.

*Id.* (emphasis added). The Eleventh Circuit summarily affirmed the district court's opinion.

Finally, in a case that began before *Zipes* was decided, but which reached its final resolution shortly thereafter, the Seventh Circuit found that it was permissible to award fees against intervenors. *Charles v. Daley*, 846 F.2d 1057 (7th Cir. 1988). In *Charles*, three doctors intervened early in the litigation to defend the Illinois Abortion Act. The intervenors and the state-official defendants litigated in concert through two unsuccessful appeals to the Seventh Circuit, but only the intervenor-defendants pursued an appeal to the Supreme Court. The Supreme Court denied certiorari in *Charles* shortly after it issued the *Zipes* opinion.

It is not clear to what extent *Charles* survives *Zipes*. The Third Circuit, in *Thorstenn v. Barnard*, addressed the argument "that *Zipes* must be distinguishable here because the Supreme Court denied ... certiorari in *Charles*" rather than remanding for reconsideration in light of *Zipes*. 883 F.2d 217, 220 (3d Cir. 1989). The court noted that the Supreme Court had "apparently been withholding action on the [*Charles*] petition" pending its decision in *Zipes*. *Id.* In light of that timing, it concluded: "Our best evaluation is that because the intervenors there were advancing interests separate and distinct from those asserted by the state defendants and

vigorously pressing them throughout, the Court may have viewed the intervenors as functional defendants and thus outside the *Zipes* ruling." *Id.* Therefore, as the Third Circuit pointed out, even though the denial of certiorari does not carry any legal significance, the procedural posture of the *Charles* decision suggests that the Supreme Court recognized the possibility of a distinction between *Charles* and *Zipes* even at the time the cases were decided in 1989.

### 2. *Rum Creek* Does Not Apply

Our understanding of this distinction is not altered by the Fourth Circuit's decision in *Rum Creek v. Caperton*, 31 F.3d 169 (4th Cir. 1994). There, the AFL–CIO Union intervened on behalf of striking workers to defend the constitutionality of a statute that precluded police officers from enforcing trespassing laws during a coal mine strike. The Court eventually invalidated the statute and was presented with the question of whether to award attorney's fees against defendants for plaintiffs work opposing the union's motion to intervene. In considering this question, the Court noted that "union intervention for the protection of union members, while not a disfavored activity in civil rights cases, nevertheless is not the type of conduct that fee-shifting statutes were intended to encourage." *Id.* at 177 (citing *Zipes*, 491 U.S. at 765, 109 S.Ct. 2732). With union participation as a backdrop, the Court took a broad reading of *Zipes* and found that Defendants were not liable for fees incurred in opposing the Union's intervention.

*Rum Creek* is plainly distinguishable from this case. First, the question present-

ed there dealt with awarding fees against defendants rather than against intervenors themselves. Second, as was the case in *Zipes*, the Union represented the third-party interests of workers who were not immediately affected by the strike at the Rum Creek coal mine. The *Zipes* and *Rum Creek* courts both recognized the important role that unions can play in civil rights litigation and thus were reluctant to punish the unions for advocating for the interests of their members in those cases. In comparison, the Virginia Representatives who intervened in this case did so on their own behalf, without the support of the legislature as a whole, and without the presence of any union. Third, and most importantly, in *Rum Creek*, the AFL–CIO's legal interests were perfectly aligned with defendants' litigation position throughout the lawsuit. At no point did the Rum Creek workers abandon their defense of the law, and therefore the question of intervenor standing was never raised. Based on these three factors, which largely parallel the factors that distinguish *Zipes*, we find that *Rum Creek* does not control the answer to the question before us.

### 3. Intervenors Are Liable For Attorney's Fees Under § 1988

■ In evaluating the caselaw, we find that the persuasive logic of the Third, Seventh, and Eleventh Circuits guides the appropriate resolution of this matter. Indeed, much of *Zipes's* reasoning is simply inapplicable to the case at hand.[6] Principally, the "central fact" of *Zipes*—that the union intervened to protect distinct third-party interests—is absent here. 491 U.S. at 765–66, 109 S.Ct. 2732. The contractual seniori-

---

6. We initially agree with the dissent that *Zipes* adopts a categorical rule. *See* Dissent, *post*, at 959–60. Our divergence in opinion lies in the breadth of the category affected by the ruling. While the dissent argues that the term "inter-

venor" automatically bestows absolute immunity from attorney's fees, we find that *Zipes* is better understood by exploring the opinion's analytical points rather than relying on its procedural labels.

ty rights at risk in *Zipes* bear no resemblance to the voting rights at issue in this case. The key interests here belonged to the citizens of the Commonwealth of Virginia, who enjoyed a well-established right to cast their vote under a non-discriminatory districting scheme.

The representatives who intervened in this case may argue that their reelection was of personal importance, but reelection under an unconstitutional districting regime cannot be considered a cognizable third-party interest. Moreover, at a previous stage of this litigation, we explicitly recognized the continuity of interests between Defendants and Intervenors: "Since there is no distinction between the interests of Defendants and Intervenor–Defendants, we refer to them collectively." Mem. Op. at 4 n.5 (Oct. 7, 2014), Dkt. No. 109. Ultimately, the Supreme Court confirmed this view when it held that the Intervenors did not have a separate legal interest from Defendants and dismissed their appeal for lack of standing. *See Wittman v. Personhuballah*, —— U.S. ——, 136 S.Ct. 1732, 195 L.Ed.2d 37 (2016).[7]

The lack of a cognizable third-party interest helps explain why Intervenors are not "blameless" or "innocent" as those terms are used in *Zipes*. As was the case in *Mallory*, "[intervenors] defended the unconstitutional statute voluntarily and in doing so attempted to aid in the offending statute's enforcement ... [They] cannot be 'innocent' in terms of violating the Plaintiff's civil rights." *Mallory v. Harkness*, 923 F.Supp. at 1553. Thus, rather than

proceeding as typical intervenors, the substance of this case, as well as its procedural posture, placed Intervenors in the role of functional defendants. *See id.* at 1553 (rejecting the argument that intervenors could "defend that statute on the merits as an intervenor in federal court, and then attempt to use its intervenor status to escape liability for attorney's fees").

This point brings out a critical distinction in the law. In *Zipes*, the Court was concerned with an illegal *practice*, which made it easy to cast blame on the offending actor—Trans World Airlines. In *Zipes*, only Trans World Airlines could remedy its violations of the Civil Rights Act. By contrast, as in *Mallory*, the issue in this case is an unconstitutional *law*. As such, the concept of "liability on the merits" is fundamentally different. Defendants did not stand to win or lose anything tangible if they were defeated in court; they had no property or liberty interests at stake in the case and they could not be "blameworthy" in any moral sense. Conversely, a "merits" victory for Plaintiffs could only come in the form of a final judicial declaration that the District's borders were unconstitutional. Therefore, so long as someone defended the statute, Plaintiffs could not prevail on the merits. In other words, after this Court found that Congressional District 3 was unconstitutionally drawn, the Intervenor–Defendants, as Plaintiffs' sole opposition, had the ability to grant Plaintiffs' relief *on the merits* by simply dropping its defense.[8] This would have al-

---

7. The Supreme Court found that Representatives Wittman and Brat were not seeking election in Congressional District 3 and 4 and that they had not presented facts suggesting their election campaign would be changed by the remedial plan. Representative Forbes was similarly found to lack standing because he decided not to run in Congressional District 4.

8. The Dissent contends that this situation is analogous to *Zipes* because the Intervenor there also "could have granted the relief sought by the Plaintiffs and ended the case 'by simply dropping its defense.'" Dissent, *post* at 960. Respectfully, this conclusion overlooks the underlying merits of the case. In *Zipes*, Plaintiffs originally sought "reinstatement, back pay, and other relief." *See Air Lines*

lowed the Court's declaration to rest unchallenged, and its injunction to remain undisturbed—precisely the relief Plaintiffs sought in their complaint.[9] When they failed to do so, "blame," as *Zipes* defined it, could only lie with Intervenors, who fully and willingly defended the law.

In our view, the dissent fails to properly engage with this distinction. Instead, the dissent's opinion mechanically repeats: "[t]he fundamental and animating principle enunciated in *Zipes* is that an intervenor's fee liability must run with merits liability." Dissent, *post* at 958. It goes on to note that, "[m]ost 'crucially,' the Intervenor–Defendants here are analogous to the *Zipes* intervenors ... because they are not, in any plausible way, responsible for 'violat[ing] the Civil Rights Act or any other federal law.'" *Id.* at 52 (quoting *Zipes*, 491 U.S. at 755, 109 S.Ct. 2732). This passage conspicuously ignores the fact that *we never held that any of the defendants violated federal law.*[10] To the contrary, we held "that the challenged Third Congressional District violates the Equal Protection Clause of the Fourteenth

Amendment." Mem. Op. at 13 (Oct. 7, 2014), Dkt. No. 109.

We agree that, under *Zipes*, fee liability should lie with the party "liable on the merits" for the boundaries of the Third Congressional District. Here, that is the Commonwealth of Virginia, whose laws ran afoul of the Federal Constitution. As a practical matter, one could also cast "blame" on the members of the Virginia Legislature who drew the lines of the District. The problem is that these "blameworthy" defendants are immune from suit under the Eleventh Amendment and the doctrine of legislative immunity. *See* U.S. Const. amend. XI; *see also Kentucky v. Graham*, 473 U.S. 159, 164, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (holding that absolute legislative immunity shielded defendants for acts taken in their legislative capacity). As such, the defendants, whether they were the Attorney General, the individuals on the Board of Elections, or the intervening Representatives, were only "liable" in their capacity as representatives of the sovereign will of the Commonwealth.[11] They were not legally capable of "violating federal law—the way the term is

---

*Stewards & Stewardesses Ass'n Local 550 v. Am. Airlines, Inc.*, 455 F.2d 101, 103 (7th Cir. 1972) (addressing merits-related questions that arose before the fee issues in *Zipes* ). Only the Defendant-employer could award this relief; the Intervenor had absolutely no power to grant Plaintiffs' desired remedy. In that sense, although the Intervenor–Union could have granted Plaintiffs (and Defendant) *some form* of relief by finally ending their dispute, at no point did it have the power to award the merits relief that Plaintiffs had originally sought.

9. Plaintiffs' Complaint sought "a declaration that Virginia's Congressional District 3 is invalid and an injunction prohibiting the Defendants from calling, holding, supervising, or taking any action with respect to Congressional elections based on Congressional District 3 as it currently stands." Compl. ¶ 6.

10. This stands in contrast with *Zipes* and *Graham*, in which the defendants' liability was undisputed. In *Zipes*, the intervenors sought to amend a class action consent decree that came as a result of Trans World Airlines' policy of sex discrimination. 491 U.S. at 757, 109 S.Ct. 2732. The "blameworthy" party was clear; it was the airline that *violated* the Civil Rights Act of 1964. *Id.* Similarly, in *Kentucky v. Graham* (a case relied upon by *Zipes* ), the "blameworthy" parties were the police officers who were responsible for "a deprivation of numerous federal rights." 473 U.S. at 161, 105 S.Ct. 3099.

11. The first iteration of "Original Defendants, the Virginia State Board of Elections and Kenneth T. Cuccinelli II, Attorney General of Virginia, were dismissed from this case via stipulation of dismissal on November 21, 2013." Mem. Op. at 3 n.4 (Oct. 7, 2014), Dkt. No. 109.

actually used in *Zipes*." Dissent, *post* at 960. Nonetheless, as the sole defenders of the Commonwealth's laws, Intervenor–Defendants were capable of fully granting Plaintiffs' relief on the merits, and they therefore assumed the risk of being "liable on the merits" for the unconstitutional borders of the District as well.

Along with the Eleventh Circuit, the Third and Seventh Circuits have confirmed this distinction in analogous cases. *See Planned Parenthood of Central New Jersey*, 297 F.3d at 255–56; *Charles*, 846 F.2d at 1068 (7th Cir. 1988). In both *Planned Parenthood* and *Charles*, Intervenors did not allege distinct third-party interests that reached beyond the enforcement of the law. Though intervenors in both cases inserted themselves into the lawsuit on behalf of doctors and prenatal patients, the interests of those individuals were not separate from the interests alleged by the state in passing and defending the law. The focus of the litigation was the validity of the statutes; either they were constitutional or they were not. Neither creative settlements nor collateral effects could have caused separate injuries to the intervenors. As such, intervenors' interests were directly aligned with those of the defendants, and they were well-positioned to step in when defendants bowed out of the litigation.

Notably, the original defendants in *Charles* and *Planned Parenthood* did withdraw their respective legal defenses and leave intervenors to continue as functional defendants. In both of those cases (as in this case), the original defendants were swiftly and seamlessly replaced by intervenors who adopted defendants' legal positions and "vigorously defend[ed] the

constitutionality of the Act[s]." *Planned Parenthood*, 297 F.3d at 258. The procedural and factual postures of these cases more closely align to the instant case than do the facts of *Zipes*, where intervenors were protecting the interests of absent union members, and the constitutionality of a law was not at issue. As such, these cases stand for the principle that when intervenors functionally replace the original defendants in the defense of an unconstitutional law, they may be held liable for attorney's fees.

The dissent attempts to distinguish these cases by emphasizing that the "intervening party was a branch of the state government." Dissent, *post* at 961. This argument has three critical faults. First and foremost, the opinions themselves make no such distinction. Instead, the cases to distinguish *Zipes* have done so based on intervenors' actions and the law at issue rather than the intervenors' status as state actors. Second, this argument fails to acknowledge that both the original defendants *and* the intervenors in *Mallory* and *Planned Parenthood* were branches of the state government. Accordingly, it would not matter whether the original or the intervening defendants were liable for fees because they were both organs of the state. Finally, the dissent does not give any weight to the fact that intervenors here were congressional representatives. Although this does not technically make them state officials, their government positions nonetheless distinguished them from private intervenors, such as the union in *Zipes*. This distinction is evident in their standing arguments, which relied on the fact that they were seeking *reelection*.[12] *See Wittman*, 136 S.Ct. at 1736–37

---

12. The dissent poses the question: "how can the Intervenor–Defendants be 'liable on the merits' if they lacked standing to appeal the actual merits decision in the case?" Dissent, *post* at 964. The answer lies in this Court's May 11, 2015 Order, which found that Intervenors *did* have standing at that time. *See* Order Granting Motion to Intervene, Dkt. No.

(rejecting the argument that Intervenor–Defendants had "standing to challenge the District Court's order because, unless the Enacted Plan is reinstated, a portion of their base electorate will necessarily be replaced with unfavorable ... voters, thereby reducing the likelihood of the Representatives' reelection.") (internal quotations and alterations omitted). As such, we are not convinced by the dissent's attempt to distinguish this trend of circuit court precedent.

Our conclusion fits neatly with the existing legal framework of this Circuit. When the roles are reversed and intervenors enjoy the status of prevailing parties in civil rights litigation, they are eligible for fee awards. *See Shaw v. Hunt*, 154 F.3d 161, 168 (4th Cir. 1998) (holding that "[o]riginal Intervenors, being prevailing parties, may recover their attorney's fees under § 1988 for work performed throughout the entire action"); *see also King v. Ill. State Bd. of Elections*, 410 F.3d 404, 416–20 (7th Cir. 2005) (surveying caselaw and concluding that "defendant-intervenors are, in some circumstances, entitled to attorneys' fees under fee-shifting statutes"). It would be illogical to conclude that intervenors should be eligible for fee awards, but rarely, if ever, liable for fees.

If *Zipes* is applied broadly to mean that good-faith intervenors are only responsible for fees under the demanding *Christiansburg* standard, then civil rights plaintiffs will risk losing the attorney's fees that § 1988 was designed to provide. This potential problem is exacerbated where, as here, defendants affirmatively stop litigating the case. As an illustration, consider what would happen if defendants declined to defend a statute at the outset and left intervenors to litigate the entirety of the suit (as was the case in *Planned Parenthood*). Under the dissent's application of *Zipes*, this would render Plaintiffs responsible for all of the attorney's fees incurred. In *Zipes*, the Court reasoned "[t]hat *defendant* will ... be liable for all of the fees expended by the plaintiff in litigating the claim against him, and that liability alone creates a *substantial added incentive* for victims ... to sue." *Zipes*, 491 U.S. at 761, 109 S.Ct. 2732 (emphasis added). If defendants are absent from the case and no longer responsible for intervenor-related fees, however, this logic stands on shaky ground.

Finally, the context of an unconstitutional gerrymander distinguishes this case from *Zipes* on principles of judicial economy. Plaintiffs' case could not have been resolved by a typical conduct-based contractual settlement. In its first merits opinion, this Court found that CD3 was designed with an impermissible focus on race. Therefore, the boundaries of the District could not simply be altered by negotiation between the parties; they instead required a complete redesign by the legislature (or in this case, by the Court with assistance from a special master).

Hence, the conflict in this case is simply not analogous to the Title VII framework discussed in *Martin*, 490 U.S. at 768, 109 S.Ct. 2180. In *Martin*, the Court explained that "parties who choose to resolve litigation through settlement may not dispose of the claims of a third party ... without that party's agreement. A court's approval of a consent decree between some of the parties therefore cannot dispose of the valid

165 (finding that movants had "satisfied the requirements of Fed. R. Civ. P. 24 and the principles governing standing"). That conclusion was only reversed by the Supreme Court after Intervenors affirmatively changed the districts in which they were seeking reelection. *See Wittman*, 136 S.Ct. at 1736–37. The Supreme Court's standing decision also resolved the substantive disputes between the parties. *See id.*

claims of nonconsenting intervenors." *Id.* (quoting *Firefighters v. Cleveland*, 478 U.S. 501, 529, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986)). Employers subject to Title VII will often have a variety of employees on their payroll. These individuals have different ages, races, genders, job titles, rates of compensation, and seniority levels. As such, preferential remedial treatment to one group can easily alter the rights of others.

By contrast, seniority rights, compensation levels, gender, and race have no bearing on a citizen's constitutional right to vote. "[T]he Federal Constitution intends that when qualified voters elect members of Congress[,] each vote be given as much weight as any other vote." *Reynolds v. Sims*, 377 U.S. 533, 559, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). The remedial plan here was adopted to cure a discriminatory districting regime that violated the Equal Protection Clause, and therefore any cognizable collateral challenge to the Plan would need to allege a separate constitutional violation in order to be viable. *See United Jewish Orgs. of Williamsburgh, Inc. v. Carey*, 430 U.S. 144, 165, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977) ("New York was free to do what it did as long as it did not violate the Constitution, particularly the Fourteenth and Fifteenth Amendments ..."). Given the Special Master's task of re-drawing constitutional district lines, it is difficult to imagine any such challenge. Therefore, unlike the collateral attacks available to would-be intervenors in Title VII settlements, the instant lawsuit presented the only opportunity for Intervenors to effectively challenge Plaintiffs' legal position without alleging a separate constitutional violation.

Thus, in examining the four key factors underlying the *Zipes* decision, we find them all to be distinguishable from the circumstances of this case. First, Interve-nors are not "blameless" because they intervened specifically to enforce and defend an unconstitutional gerrymander that impacted the voting rights of thousands of citizens. Second, when Defendants abandoned their defense of the law, it removed the party that would otherwise shoulder responsibility for paying the attorney's fees that facilitate important civil rights litigation. Third, Intervenors did not seek to protect the interests of any third parties, but instead became functional defendants when they took the exact same legal position as the defendants they replaced. Finally, intervenors' inability to levy collateral attacks against the new redistricting plan negated the judicial economy concerns that are present in Title VII litigation. The absence of these supporting logical pillars undercuts the broad language in *Zipes* and draws this case well within the purview of *Mallory, Planned Parenthood,* and *Charles*, which we find persuasive.

There are various policy benefits to adopting this approach. For one, it ensures that plaintiffs pursuing civil rights claims are adequately reimbursed for their efforts when those claims are meritorious. Further, although it could potentially deter intervenors from fiercely defending the laws they support, the effects of this phenomenon are minimized by the ability of would-be intervenors to proceed as *amici curiae. See Zipes*, 491 U.S. at 778 n.8, 109 S.Ct. 2732 (Marshall, J., dissenting). Finally, where unconstitutional laws rather than illegal practices are challenged, the initial defendant is often the state. Placing responsibility for intervention-related fees on intervenors rather than defendants means that the burden of paying those fees will not fall on the taxpayers, but will instead lie with the intervening party, who volunteered its resources to defend an unconstitutional law.

In holding that *Zipes*'s broad language does not govern this case, we stress the narrow scope of our decision. Intervenors play an important role in civil rights litigation and they should not be punished for seeking to protect the legitimate third-party interests of their members or constituents. This is especially true in the context of traditional Title VII settlements or equitable injunctions, where illegal practices rather than unconstitutional laws are challenged, and where collateral attacks are both permissible and more likely. *See Jenkins v. Missouri*, 967 F.2d 1248, 1250 (8th Cir. 1992) ("[D]efending the chosen remedy in a desegregation case is an integral part of the plaintiffs' role in the private enforcement of civil rights laws.").

Finally, our interpretation of the caselaw is wholly consistent with the language of the statute, which allows the court to award attorney's fees to the "prevailing party." 42 U.S.C. § 1988. A critical factor in this case was that Defendants not only declined to pursue a second appeal, but *actively made arguments in support of Plaintiffs' position* after *Alabama* was decided. *See generally* Defs' Opening Br. Regarding the Legal Effect of *Alabama Legislative Black Caucus v. Alabama* at 3, Dkt. No. 145. Once Defendants and Plaintiffs were aligned in their respective legal positions, the language of § 1988 begs the question: against whom did Plaintiffs prevail? In this case, the only logical answer is the Intervenors.

### 4. Allocation between Defendants and Intervenors

█ Having decided that Intervenors can be held liable for the fees and costs that they were responsible for creating, the next question is how to apportion the fees and costs between Intervenors and the original Defendants. To begin, the Fourth Circuit has held that "district court[s] enjoy[ ] considerable latitude in deciding how [they] will allocate fees." *Jones v. Southpeak Interactive Corp. of Del.*, 777 F.3d 658, 677 (4th Cir. 2015). Courts may distribute the award equally, apportion the award based on culpability, adjust the award based on damages, or hold a single defendant solely responsible. *Id.* (citing *Council for Periodical Distribs. Ass'ns v. Evans*, 827 F.2d 1483, 1487–88 (11th Cir. 1987)). Moreover, courts are empowered to combine these methods or select a different method entirely. *Id.*

The cases addressing the issue of apportionment to intervenors previously have used a few of these tools. The court in *Charles* simply found that intervenors were liable for one half of the total fees awarded as "fully participating parties in the lawsuit." *Charles*, 846 F.2d at 1061. In *Mallory*, the court engaged in a slightly more nuanced discussion. It noted that "under § 1988 the governmental entity charged with administering an offending statute exposes itself to liability for attorney's fees and costs." *Mallory*, 923 F.Supp. at 1552. On the other hand, the defendant in that case "had no input in enacting the unconstitutional statute[,] no responsibility with respect to implementing the provision ... [and] did nothing to increase the amount of litigation." *Id.* The Court found those arguments "well taken" and held that Intervenors were liable for 60% and Defendants liable for 40% of the fees awarded. *Id.* Using similar logic, the district court in *Daggett* placed responsibility for the entirety of the fee award on the intervenors. *Daggett v. Kimmelman*, No. CIV. 82-297, 1989 WL 120742, at *2 (D.N.J. July 18, 1989).

These cases do not provide a single guiding principle so much as they affirm the district court's discretion in apportioning fees. Nonetheless, their reasoning is instructive. Defendants here are not responsible for passing the law, defending

the law, or prolonging the litigation after the case was remanded in light of *Alabama*. Indeed, their briefing was substantially aligned with Plaintiffs from that point forward. *See* Defs.' Opening Br. Regarding the Legal Effect of *Alabama* (Apr. 13, 2015), Dkt. No. 145. Conversely, Intervenors are not liable for enforcing the law or defending it in the first instance, and cannot be deemed "blameworthy" before the point at which they intervened in the lawsuit.

■ We therefore find that Defendants' brief on the effect of *Alabama* marks a turning point in this case. Before that point, Defendants are fully liable for attorney's fees as the primary enforcers and defenders of the unconstitutionally-drawn district. After that change in position, however, responsibility shifted to Intervenors, who significantly prolonged the litigation by vigorously defending the unconstitutional districting scheme. As a result, we find that Intervenors should bear responsibility for the fees and costs Plaintiffs incurred in successfully litigating its claims on remand and again on appeal to the Supreme Court. Each intervenor will be jointly and severally liable for these fees. Because Defendants are responsible for enforcing the offending statute, however, they are still solely liable for the work done in the remedial phase of the litigation.

In light of this reasoning, we hold that the Original Defendants are liable for 28% of the fees in the Third Petition.[13] This figure represents the percentage of fees claimed before April 14, 2015, the day after Defendants filed their Brief on the effect of *Alabama*. After this date, Plaintiffs' billing records reveal a sharp shift in focus to center on Intervenors. As such, Intervenor–Defendants are responsible for the remaining 72% of fees.

We likewise hold that the Original Defendants are responsible for 14% of the fees awarded for the Fourth Petition. This figure approximates the percentage of billing entries that relate to work done on the remedial plan.[14] The Intervenor–Defendants are liable for the remaining 86% of the fees in the Fourth Petition. These percentage allocations will be applied to the final fee awards below.

### B. Legal Standard for Awarding Fees

■ We now move to the specifics of the fee award. Section 1988 provides that "the court, in its discretion, may allow the prevailing party [in an action brought under 42 U.S.C. § 1983] ... a reasonable attorney's fee."[15] 42 U.S.C. § 1988(b). Because § 1988 serves "to ensure effective access to the judicial process for persons

---

**13.** We arrived at this figure by calculating the quantum of fees accrued prior to April 14, 2015 ($20,747.50) and dividing it by the total fees claimed in the Third Petition ($73,540.50).

**14.** Specifically, this was calculated by searching an Excel spreadsheet version of Appendix A to Dkt. No. 317 for the term "remed". The narrative entries that hit on this term yielded a total of $88,426. We then divided that number by the total quantity of fees sought in the Fourth Petition ($625,332).

**15.** Plaintiffs also cite § 10310(e) of the Voting Rights Act as a basis for recovery of fees and

costs. That section provides that "[i]n any action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee, reasonable expert fees, and other reasonable litigation expenses as part of the costs." 52 U.S.C. § 10310(e). Because § 10310 and § 1988 share parallel language and purposes, courts construe them similarly. *See Texas v. United States*, 798 F.3d 1108, 1113 (D.C. Cir. 2015).

with civil rights grievances[,] .... a prevailing plaintiff should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." *Hensley v. Eckerhart*, 461 U.S. 424, 429, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) (internal quotation marks and citation omitted).

■ This Circuit employs a three-step process in determining a reasonable fee. "First, the court must determine the lodestar figure by multiplying the number of reasonable hours expended times a reasonable rate." *McAfee v. Boczar*, 738 F.3d 81, 88 (4th Cir. 2013). In determining the reasonable number of hours and a reasonable rate, the court may consider the twelve-factors set out in *Johnson v. Georgia Highway Express Inc.*:

> (1) The time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation, and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.

488 F.2d 714, 717–19 (5th Cir.1974). There is "a strong presumption that the lodestar represents the reasonable fee." *City of Burlington v. Dague*, 505 U.S. 557, 562, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992) (internal quotation marks omitted).

■ After the lodestar figure is calculated, "the court must subtract fees for hours spent on unsuccessful claims unrelated to successful ones." *McAfee*, 738 F.3d at 88. Finally, the court "award[s] some percentage of the remaining amount, depending on the degree of success enjoyed by the plaintiff." *Id.*

## C. Reinstatement of the First Fee Award

Following the bench trial and the first entry of judgment in Plaintiffs' favor, we awarded Plaintiffs $691,337.40 in attorney's fees, $49,448.79 in expert fees, and $38,403.20 in costs against Defendants. On Defendants' motion, we stayed enforcement of the fee award pending resolution of Intervenor–Defendants' first appeal to the Supreme Court. Plaintiffs now ask us to reaffirm and reenter that award. Defendants raise no objection. Accordingly, this portion of Plaintiffs' motion is granted in full, and we now reinstate the earlier award of $779,189.39.

## D. Supplemental Fee Awards

■ Plaintiffs request two supplemental awards totaling $718,189.25. The threshold question of Plaintiffs' status as the prevailing party is undisputed. "A plaintiff prevails ... when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." *Lefemine v. Wideman*, 568 U.S. 1, 133 S.Ct. 9, 11, 184 L.Ed.2d 313 (2012) (internal quotation marks omitted). "[A]n injunction or declaratory judgment, like a damages award, will usually satisfy that test." *Id.* Here, Plaintiffs sought declaratory and injunctive relief. We twice held that the Third Congressional District was an unconstitutional racial gerrymander and twice enjoined the Commonwealth from conducting elections under the 2012 plan.

Plaintiffs prevailed, and they are entitled to a reasonable fee award.

### 1. Lodestar Analysis

We "must first determine a lodestar figure by multiplying the number of reasonable hours expended times a reasonable rate." *Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 243 (4th Cir. 2009). Because the parties divide their arguments on these points between Plaintiffs' third and fourth supplemental petitions, we follow suit.

#### a. *Third Supplemental Petition*

As explained above, we declined to reach Plaintiffs' third supplemental motion for fees arising out of their work on remand given the then-existing posture of the case before the Supreme Court. Plaintiffs now renew that request for $73,540.50 in fees for 175.3 hours of work. Defendants and Interveners separately dispute the reasonableness of Plaintiffs' claim. Plaintiffs seek to recover at the Richmond market rates that we previously employed in ruling on Plaintiffs' first fee petition. Both Defendants and Intervenors agree that use of these rates is proper. Accordingly, we incorporate that earlier discussion here, *see Page v. Va. State Bd. of Elections*, No. 3:13-cv-678, 2015 WL 11256614, at *4–8 (E.D. Va. March 11, 2015), and set out those fees again in the table below.[16]

| Attorney | Title | Hourly Rate |
|---|---|---|
| Elias, Marc E. | Senior Partner | $575 |
| Hamilton, Kevin J. | Senior Partner | $575 |
| Devaney, John M. | Senior Partner | $575 |
| Spiva, Bruce | Senior Partner | $575 |
| Roche, John K. | Junior Partner | $465 |
| Khanna, Abha | Senior Associate | $410 |
| Stafford, William | Senior Associate | $405 |
| Frost, Elisabeth C. | Senior Associate | $390 |
| Branch, Aria C. | Junior Associate | $345 |
| Louijeune, Ruthzee | Junior Associate | $320 |
| Gonski, Sarah | Junior Associate | $310 |
| Marino, Patricia | Paralegal | $190 |

Plaintiffs claim a total of 175.3 hours of work in their third fee petition, including 43.7 hours spent preparing and defending their third fee petition. In support, Plaintiffs submitted billing sheets and the declaration of Kevin Hamilton, a senior partner with Perkins Coie.

▆▆▆ Intervenors contend that Plaintiffs' work on remand was excessive, overstaffed, and duplicative. There are three primary examples of this. First, Intervenors argue that Plaintiffs' overstaffing inflated the billing records related to the *Alabama* briefing. The records reveal that seven Perkins Coie attorneys billed time towards the opening and reply briefs. As a general matter, "[t]here is nothing inherently unreasonable about having multiple attorneys perform ... work." *Burns v. Anderson*, No. 1:02-cv-1326, 2006 WL 2456372, at *6 (E.D. Va. Aug. 22, 2006). In this case, however, we find that the involvement of seven attorneys on this brief was excessive. Plaintiffs explain this staff-

---

**16.** This chart includes five new individuals. In a previous opinion, we determined the reasonable hourly rate of John Devaney and Patricia Marino. *See* Mem. Op & Order at 14–15 (Mar. 11, 2015), Dkt. No. 139. In determining the rates for Bruce Spiva, Ruthzee Louijeune, and Sara Gonski, we rely on the biographies submitted as exhibits to the Declaration of Kevin Hamilton and similarly apply the Richmond rates for 2015. *See* Hamilton Decl., Ex. A (July 8, 2016), Dkt. No. 318.

ing decision by pointing out that two of its attorneys, including one of the opening brief's primary drafters, Abha Khanna, left the firm on maternity leave during the pendency of the case. As a result, the replacement attorneys needed to spend significant time familiarizing themselves with the factual and procedural history of the case, as well as the substance of the brief. Certainly, Plaintiffs' attorneys are not to be faulted for spending time to get to speed in the case, or for taking maternity leave. Nonetheless, Defendants should not be forced to pay for this additional expense.

Highlighting other instances of duplicative billing, Intervenors argue that Plaintiffs seek to recover for 120.6 hours spent "generating a total of 30 pages of briefing, an average of approximately four hours per page." Intervenors' Opp'n at 7, Dkt. No. 182. This characterization is not entirely accurate because the third fee petition seeks to recover for *all* of Plaintiffs' work on this matter while the case was on remand. On the other hand, the *Alabama* brief was the most prominent piece of work product produced on remand. Moreover, by this time, Plaintiffs were collaborating with Defendants regarding the effect of the *Alabama* decision. This joint effort should have allowed Plaintiffs' counsel to be more, rather than less, efficient with their time because they only had to respond to one set of arguments. Therefore, although the billing records are appropriately detailed, the amount of time devoted to the *Alabama* briefing was more than we find reasonably necessary to complete that task.

Third, Defendants challenge the reasonableness of 45.6 hours spent in Plaintiffs'

opposition to the intervention of Representatives Comstock and Brat, as well as Plaintiffs' related research on a motion to dismiss for lack of standing that was never filed.[17] Plaintiffs' theory in opposing the intervention was that all Intervenor–Defendants, including Representatives Brat and Comstock, could no longer independently demonstrate standing in the wake of Defendants' decision not to defend the constitutionality of District 3.

■ The touchstone of the lodestar inquiry is reasonableness. *See Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). When a party conducts research on a collateral issue that proves to be irrelevant to the disposition of the case, it is within the court's authority to deduct that time from the ultimate lodestar figure. *See, e.g., Peterson v. Islamic Republic of Iran*, No. 13-CV-9195 KBF, 2015 WL 3561415, at *2 (S.D.N.Y. June 8, 2015) (holding that the prevailing party could not recover fees incurred for a Rule 11 motion that was never filed). Where the research is reasonable in relation to the circumstances of the case, however, the prevailing party may recover even though the motion was never filed. *See In re Gen. Motors Corp.*, 110 F.3d 1003, 1021 (4th Cir. 1997) (holding that time spent researching and preparing a writ of mandamus that was never filed was a reasonable and foreseeable reaction to respondent's litigation strategies).

In conducting the reasonableness inquiry here, we find that the time spent researching the issue of intervenors' standing duplicated work that was later completed in the Supreme Court briefing and should be discounted. Plaintiffs' standing research formed the basis of

---

17. In support of this argument, Defendants cite to a particular discussion within *Rum Creek Coal Sales, Inc. v. Caperton*, 31 F.3d 169 (4th Cir. 1994), that sets out a basis for denying intervention-related fees against a losing defendant. For the reasons discussed above in Section II. A.2, we find *Rum Creek* distinguishable from the case at hand.

their argument against intervention, their unfiled motion to dismiss, and a huge portion of their work before the Supreme Court. Although Plaintiffs were unsuccessful in their standing argument at the trial court level, that same basic theory was ultimately dispositive before the Supreme Court, and therefore it is inappropriate to suggest that this work was "so unrelated [to the matters on which Plaintiffs prevailed] as to justify treating it as a 'separate lawsuit.'" *Plyler v. Evatt*, 902 F.2d 273, 280 (4th Cir. 1990). Nonetheless, in their Fourth Petition, Plaintiffs claim fees for approximately 178 additional hours in time entries that explicitly mention standing in the billing notes.[18] When combined with the hours spent researching and opposing motions prior to the appeal, the sheer quantity of hours spent on this discrete issue provides strong evidence that Plaintiffs' efforts were duplicative. Accordingly, those hours merit a deduction.

Finally, Defendants object to Plaintiffs' recovery for 43.7 hours spent preparing and defending the Third Petition. This work yielded fees totaling $17,564.50.[19] We previously reduced Plaintiffs' recovery for preparation of the first and second supplemental fee petitions from $75,017.50 to $10,000, a difference of $65,017.50. We reasoned that, even assuming the number of hours expended was reasonable, "the exercise of billing judgment would necessitate the conclusion that a reasonable fee for th[e] endeavor is far less [than the amount requested]." *Page*, 2015 WL 11256614, at *12 (quoting *McAfee v. Boczar*, No. 3:11-cv-646, 2012 WL 6623038, at *3 (E.D. Va.

Dec. 19, 2012), *aff'd in part, vacated and remanded in part*, 738 F.3d 81 (4th Cir. 2013)).

In preparing their third supplemental fee petition, Plaintiffs had to account for only two and a half months of work—compared to 2,164.96 billable hours in the first petition. However, Plaintiffs' third petition raised for the first time the question of intervenors' fee liability and the allocation of the fee award between Intervenors and Defendants. As discussed above, this presented a question of first impression in this Circuit. Moreover, seeking fees against both Intervenors and Defendants required Plaintiffs to defend their petition against two sets of arguments and objections. Balancing the complexity of issues raised and the additional burden of intervenors' involvement against the shorter timeframe and the reduced number of hours covered, we again find a flat fee of $10,000 to be reasonable.

Because the final calculation of fees for the Third Petition will be applied across the board, a complete lodestar table is not required. We first reduce the $55,976 requested by 15%, resulting in an award of $47,579.60. We then add the additional $10,000 for fees incurred in preparing the petition to reach a final figure of $57,579.60. Applying the fee allocation discussed above, the Original Defendants are therefore responsible for 28%, or $16,122.29, of this award. Intervenor–Defendants are responsible for the remaining $41,457.31.

b. *Fourth Supplemental Petition*

Plaintiffs' Fourth Petition seeks a final supplemental award of $644,648.75 for

---

18. This estimate is made with the understanding that there are likely many other entries related to standing that are vaguely recorded as communications relating to "briefing" or "oral argument."

19. Defendants do not contest $4,935.50 of the $22,500 claimed in Plaintiffs' Reply Brief. *See* Defs.' Br. in Opp'n to Fourth Fees Pet., Ex. 3, Dkt. No. 321–3 at 3.

work during the remedial phase and the second appeal to the Supreme Court. Specifically, this includes: (1) $617,281 in attorney's fees[20]; (2) $19,316.75 in costs; and (3) $8,051 in "fees on fees" claimed in Plaintiffs' Reply Brief. Plaintiffs again seek recovery at Richmond market rates, but they contend it is reasonable to use increased rates for all work completed in 2016. Their proposed 2016 rates reflect the actual dollar-amount increase in each Perkins Coie attorney's individual billing rate. For example, Ms. Khanna, counsel in Perkins Coie's Seattle office, increased her rate by $25 in 2016 to $525 per hour. Plaintiffs argue that it is reasonable to account for that $25 increase in Ms. Khanna's Richmond market rate—from $410 per hour to $435 per hour. While Plaintiffs argue these "modest adjustments ... reflect the reality that attorneys' billing rates generally are adjusted from year-to-year," Pls.' Reply at 14, Dkt. No. 322, Defendants counter that Plaintiffs have not met their burden of establishing similar rate increases in the Richmond market.

 We agree with Defendants. Experience tells us that attorneys' hourly rates may increase from year to year. But it was Plaintiffs' "burden to make out the reasonableness of [the] hourly rate with specific evidence," *Newport News Shipbuilding & Dry Dock Co. v. Holiday*, 591 F.3d 219, 230 n. 12 (4th Cir. 2009); *see also Robinson*, 560 F.3d at 244. We have already noted that "[t]he relevant market for determining the prevailing rate is ordinarily the community in which the court ... sits," *Page*, 2015 WL 11256614, at *4 (quoting *Rum Creek*, 31 F.3d at 175), and we rejected Plaintiffs' proposed use of extra-jurisdictional rates for failure to "produce[] ... specific evidence from which

the court c[ould] conclude that local counsel with the requisite skills did not exist within the Eastern District of Virginia, or if such counsel existed that they could not, or would not, have taken the case." *Id.* (quoting *Project Vote/Voting for Am., Inc. v. Long*, 887 F.Supp.2d 704, 713 (E.D. Va. 2012)). Plaintiffs have not attempted to overcome that deficiency and instead seek to recover using Richmond market rates. It is somewhat curious, then, that Plaintiffs seek an increased rate based solely on evidence of extra-jurisdictional rate increases. As Defendants correctly point out, Plaintiffs did not come forward with any evidence "that the adjustments are reasonable for the Washington, D.C. and Seattle markets (where most of Plaintiffs' attorneys are based)—let alone for the relevant Richmond market." Defs.' Opp'n at 27, Dkt. No. 321. Because Plaintiffs have not met their burden of establishing the reasonableness of an increase in rates, we will use the 2015 rates set out in the table above in calculating the lodestar figure for all work performed.

We next turn to the work claimed in the fourth petition. Plaintiffs again submit billing records and the declaration of Kevin Hamilton in support of their petition. Plaintiffs further note that this total excludes 129.7 hours (or $19,753.50) that Plaintiffs wrote off in the exercise of billing judgment. Although we reject some of Defendants' more granular arguments, we largely agree that the Fourth Petition is replete with evidence of excessive and duplicative billing that merits a significant reduction in the fee award. After reviewing the remaining hours, we find that Plaintiffs improperly seek reimbursement for (1) excessive billing; (2) duplicative work; (3) work related to other unrelated matters;

**20.** Plaintiffs initially sought $618,201.00 in fees, but concede that $960 (or 1.6 hours) related to work on another matter and they

no longer seek reimbursement for these entries. *See* Pls.' Reply in Supp. of Fourth Fees Pet. at 11 n.6, Dkt. No. 322.

(4) work that was block-billed; and (5) work accompanied by impermissibly vague time entries.

### i. *Specific Arguments*

■ As an initial matter, we reject two of Defendants' specific arguments. Defendants assert that Plaintiffs cannot recover for time spent unsuccessfully opposing Defendants' motion to authorize the Virginia Division of Legislative Services to post the proposed remedial plans and supporting materials on its website. Plaintiffs respond that, as the prevailing party, they are entitled to recover for all hours reasonably expended even if they did not prevail on each argument presented to the court along the way.

■ We agree with Plaintiffs that Defendants take too granular an approach. "[E]ntitlement to fees for one aspect of a protracted litigation does not turn narrowly on whether the party prevailed on that particular matter, but whether a separate claim or ... a separate proceeding is so unrelated as to justify treating it as a 'separate lawsuit.'" *Plyler*, 902 F.2d at 280 (quoting *Hensley*, 461 U.S. at 435, 103 S.Ct. 1933) (alteration omitted); *see also Luessenhop v. Clinton Cty., N.Y.*, 558 F.Supp.2d 247, 256 (N.D.N.Y. 2008) ("[A] prevailing party is not limited to recovery on successful motions alone. Indeed unsuccessful motions too are compensable as long as they are not frivolous."), *aff'd*, 324 Fed.Appx. 125 (2d Cir. 2009). Defendants do not contend Plaintiffs' opposition was frivolous—nor could they. Defendants likewise cannot show that the opposition was sufficiently unrelated as to justify treating it as a separate matter. The opposition was part and parcel of the remedial phase of the litigation—a phase in which Plaintiffs prevailed. Accordingly, Plaintiffs can properly recover for time spent on this matter.

Defendants next identify nine time entries that appear to relate to Plaintiffs' work on other matters. Plaintiffs agree that two entries, amounting to 1.6 hours and $920, were inadvertently included and should be deducted. Six of the remaining time entries were all entered by the same Perkins Coie paralegal. Defendants do not explain the basis for their belief that these entries relate to another matter. In any event, we are satisfied by Mr. Hamilton's sworn statement that these time entries reflect time spent assisting counsel in this matter. The final entry is for 0.1 hours for "[e]mail correspondence" between Marc Elias and other Perkins Coie attorneys regarding "FOIA request." Hamilton Decl., Ex. A at 26, Dkt. No. 317. Again, we are satisfied by Mr. Hamilton's explanation that Plaintiffs filed a request under the Freedom of Information Act early in this litigation, and that Mr. Elias's email related to that request. Accordingly, we will deduct 1.6 hours, but overrule the other objections.

### ii. *Overbilling for Oral Argument*

■ In addressing the reasonableness of Plaintiffs' Fourth Petition, however, this granular inquiry into the billing records does not fully capture the "excessive, redundant, or otherwise unnecessary" time entries in this case. *Hensley*, 461 U.S. at 434, 103 S.Ct. 1933. All told, Plaintiffs billed a staggering number of more than 500 hours for oral argument preparation. This number included work from four partners and four associates. Individually, six of those attorneys each billed from 134.3 to 345.1 hours for this stage of the litigation alone. Although preparing for a Supreme Court argument is no doubt a challenging and time-consuming task, a fee award of approximately $248,799 for this work strikes us as unreasonable. The sheer quantity of hours expended is itself enough to merit a reduction, but a few excerpts from the billing records serve to

illustrate the unreasonableness of the figures claimed by Plaintiffs.

The most prominent instance of overbilling was on the date of the oral argument itself, where Plaintiffs billed for four attorneys, not including Mr. Elias, to attend and observe oral argument.[21] Plaintiffs provide no explanation as to why billing for the attendance of four team members was reasonable. Courts have recognized that there are certain circumstances where "a lawyer who has worked on the case and will be working on it subsequently may need to observe argument to judge how to proceed later" or "because their assistance is or may be needed by the lawyer arguing the case." *Democratic Party of Wash. State v. Reed*, 388 F.3d 1281, 1286–87 (9th Cir. 2004). However, this recognition does not change the fact that Plaintiffs still must demonstrate the reasonableness of their oral argument billing records in order to be awarded fees. For at least three of their attorneys, they have not done so.

We will assume that it was reasonable for Plaintiffs to bill for the attendance of one senior team member, in addition to Mr. Elias. Therefore, we will leave Mr. Hamilton's time entries in place. But without any explanation as to why the remaining time billed was reasonable, we will deduct the other time entries from the lodestar figure.[22] *See Fross v. Cty. of Allegheny*, 848 F.Supp.2d 547, 555 (W.D. Pa. 2012) ("Although Attorneys Strassburger and Rose no doubt wished to be at the argument to witness the culmination of their efforts on this case, the client would not ordinarily pay for their presence."); *Tanco v. Haslam*, No. 3:13-cv-1159, 2016 WL 1171058, at *7 (M.D. Tenn. Mar. 25, 2016) ("While perhaps desirable, it was not *necessary* for so many attorneys to travel to and participate in meetings, moots and oral arguments. An excellent result was achieved for the client, but one that at times could likely have been achieved with the billing discipline that a fee-paying client would have demanded."); *Roe v. Saenz*, No. 97-cv-529, 2000 WL 33128689, at *2 (E.D. Cal. Nov. 20, 2000).

 Defendants also identify instances of block billing—that is, "the practice of grouping, or 'lumping,' several tasks together under a single entry, without specifying the amount of time spent on each particular task." *Guidry v. Clare*, 442 F.Supp.2d 282, 294 (E.D. Va. 2006). "Importantly, as fee claimants bear the burden of establishing the reasonableness of their claimed fee, they must 'submit documentation that reflects reliable contemporaneous recordation of time spent on legal tasks that are described with reasonable particularity sufficient to permit the court to weigh the hours claimed and exclude hours that were not reasonably expended.'" *Am. Bird Conservancy v. U.S. Fish & Wildlife Serv.*, 110 F.Supp.3d 655, 675 (E.D. Va. 2015) (quoting *Guidry*, 442 F.Supp.2d at 294). "[I]nadequate documentation is a

---

21. Specifically, Plaintiffs billed: (1) 4 hours for Elizabeth Frost to "[p]repare for and attend Supreme Court argument"; (2) 6 hours for Kevin Hamilton to "[p]repare for and attend argument in U.S. Supreme Court"; (3) 4 hours for Abha Khanna to "[p]repare for, travel to, and attend SCOTUS oral argument"; and (4) 3.5 hours for Ruthzee Louijeune to "[a]ttend SCOTUS oral argument." Hamilton Decl. Ex. A at 8–9, 25–37, 39, Dkt. No. 817.

22. We note that the Supreme Court makes transcripts of oral arguments available on the same day an argument is heard. *See* Supreme Court of the United States, Transcripts and Recordings of Oral Arguments (Oct. 2010). https://www.supremecourt.gov/oralarguments/availabilityoforalargument transcripts.aspx. Indeed, Ms. Khanna billed 1.2 hours on the day of oral argument for reviewing the transcript and emailing the legal team "regarding same."

proper basis for reducing a fee award because it prevents an accurate determination of the reasonableness of the time expended in a case." *Id.* (internal alterations and quotations omitted).

Prime examples of the block-billed entries were recorded in the week prior to Plaintiffs' argument before the Supreme Court on March 21, 2016. The first, on March 16, billed 10.8 hours for "attend[ing] out-of-office moots; offer[ing] feedback; [and] conduct[ing] research." Hamilton Decl., Ex. A at 35, Dkt. No. 317. The second, on March 17, billed 9.5 hours for "attend[ing] and participat[ing] in moots, debriefing in preparation for oral argument moot; draft[ing] and research[ing] memos and outlines for M[arc] Elias in preparation for oral argument." *Id.* at 36. The third, on March 18, billed 11.1 hours for "[p]articipat[ing] in Perkins Coie moot; debrief[ing] after same; research[ing], discuss[ing], and prepar[ing] arguments in preparation for oral argument." *Id.* Viewing these time entries in light of our experience, we find they largely paint a picture of days spent in preparation for oral argument. Nonetheless, they are entirely lacking in detail and we are unable to determine their reasonableness on their face. They therefore support a reduction in the fee award.

Defendants also identify various time entries in the weeks leading up to oral argument that they suggest are so vague as to require a percentage reduction. Vague time entries, like block billing, "frustrate the ability of a court to assess the reasonableness of the hours expended." *Doe v. Rector*, No. 1:15-cv-209, 2016 WL 3480947, at *5 (E.D. Va. June 21, 2016). Each of the challenged entries was recorded in the two weeks prior to oral argument. Eight belong to Marc Elias, who argued the case for Plaintiffs. His time entries contain some iteration of "[p]repare for Wittman oral argument." *See* Hamilton Decl., Ex. A at 32–37, Dkt. No. 317. Preparation for oral argument before the Supreme Court is itself a specific task. And one, we think, that is sufficiently distinct from examples of excessively vague time entries found in the caselaw, such as "research," "letter to client," "revise discovery," and so on. *See, e.g., Rum Creek*, 31 F.3d at 180; *Route Triple Seven Ltd. P'ship v. Total Hockey, Inc.*, 127 F.Supp.3d 607, 622 n.17 (E.D. Va. 2015). Given Mr. Elias's position as lead counsel at oral argument, this description provides an adequate basis to assess the reasonableness of the time expended. *Cf. Doe*, 2016 WL 3480947, at *5 ("Although there are instances in which more detail might have been provided, [the] attorneys' descriptions of tasks performed are in significant respect adequate, . . ."). Therefore, a vagueness reduction for Mr. Elias's time entries is not warranted.

The same cannot be said of the other entries identified by Defendants because the attorneys identified did not take part in presenting the case to the Supreme Court. Many of these entries belong to two members of the litigation team and contain generalized descriptions, such as "[o]ral argument preparation." Hamilton Decl., Ex. A at 35, Dkt. No. 317. While common sense tells us what oral argument preparation entailed for Mr. Elias, the lack of detail as to what his team's preparation included significantly inhibits our review.

In addition to these vague "oral argument" entries, Plaintiffs' billing records on the whole contain excessive entries for scheduling, attending, and preparing for moot courts. In total, this amounted to more than 161 hours in billing entries related to various moots. All seven attorneys contributed time to this sum, and many of their entries included descriptions such as: "prepare for moot court"; "prepare for

first moot by re-reading filings in case"; "follow up on moot court scheduling"; "coordinate scheduling and staffing for moot courts"; and attendance at moot courts by multiple members of the team. *See generally* Hamilton Decl. Ex. A, Dkt. No. 317. These entries lack the detail necessary to properly examine the reasonableness of the work Plaintiffs expended in preparation for oral argument and they warrant a reduction as well.

Thus, although many of the oral argument-related billing entries appear reasonable on a granular level, when examined in the aggregate, they reveal pervasive overstaffing and excessive billing in Plaintiffs' preparation for oral argument. As a result, we will reduce the fees awarded for oral argument preparation by 50% across the board, with the exception of Mr. Elias, whose preparation for, and presence at, the moots and arguments cannot reasonably be questioned.

Finally, we come again to the issue of "fees on fees." In their initial motion, Plaintiffs sought compensation for 6.3 hours of work on their fee petition in May 2016, but they noted that their reply brief would contain a full accounting of hours spent on the Petition. True to their word, Plaintiffs' reply brief included a second declaration from Kevin Hamilton and an exhibit documenting 18.2 hours of work in preparing their motion in early June 2016.[23] Instead of granting Defendants leave to file a surreply and repeating the cycle of fee award briefing *ad infinitum*, we will independently evaluate the reason-

ableness of these fees consistent with our previous opinions.[24]

Commendably, Plaintiffs spent significantly less time—24.5 hours as compared to 43.7 hours—on this final fee petition, in contrast with the time spent on the Third. Nonetheless, Plaintiffs seek more than $10,000 for work incurred in completing the Fourth Petition. At this point in the litigation, after drafting three similar petitions, the additional work spent briefing the issue of fee awards should have been minimal. Moreover, the research on the novel issue of intervenor fee liability was heavily briefed in the Third Petition by all three parties and therefore was already familiar to everyone involved. Thus, we again think a flat fee is appropriate and we reduce the "fees on fees" award in the Fourth Petition to a flat sum of $5,000.

In summary, we find that the following reductions to the Fourth Petition are appropriate: (1) a 1.6 hour reduction for work done on an unrelated case; (2) a reduction for all time spent attending oral argument, with the exception of Mr. Elias and Mr. Hamilton; (3) a 50% reduction for all work done during the oral argument phase of the litigation, with the exception of Mr. Elias's time entries; and (4) a reduction of $2,881 for "fees on fees" that were accounted for in our discussion of the Third Petition; and (5) a flat fee of $5,000 for the time spent preparing the Fourth Petition instead of the 24.1 hours claimed.

#### c. *Lodestar Figure*

The chart below details the appropriate reductions to Plaintiffs' Fourth Fees peti-

---

**23.** The filing date for the Fourth Petition was July 8, 2016, but Plaintiffs have agreed to forego any request for time spent finalizing the Petition in early July.

**24.** In their Fourth Petition, Plaintiffs seek to collect for an additional $2,881 (representing 4.7 hours for Mr. Stafford and 1.7 hours for

Mr. Hamilton) for additional work on the Third Fees Petition. As discussed above, we reduced the "fees on fees" for the Third Petition to a flat fee of $10,000. Therefore, we will deduct this $2,881 in full because it relates to work that is already accounted for in the $10,000 flat fee.

tion. After applying the 50% reduction for excessive work in the oral argument phase of the litigation, we discount a total of 258.1 hours from Plaintiffs' Fourth Petition.[25] The balance of hours yields a total fee award of $485,486, plus the flat fee of $5,000 for the work done in preparing the Fourth Petition. All told, therefore, Plaintiffs are entitled to a sum of $490,486. In accordance with the allocation discussed above, 14% of this figure, or $68,668.04, is assessed against the Original Defendants, leaving $421,817.96 to be assessed against Intervenor–Defendants.

| Attorney | Title | Hourly Rate | Date 50% Reduction Begins | Hours Recorded | Hours Deducted | Hours Awarded | Total Fees Awarded |
|---|---|---|---|---|---|---|---|
| Elias, Marc E. | Senior Partner | $575 | N/A | 134.3 | 0 | 134.3 | $77,222.5 |
| Hamilton, Kevin J. | Senior Partner | $575 | 1/29/16 | 345.1 | 69.9 | 275.2 | $158,240 |
| Devaney, John M. | Senior Partner | $575 | 12/10/15 | 18 | 9.5 | 8.5 | $4,887.5 |
| Spiva, Bruce | Senior Partner | $575 | 3/14/16 | 8.9 | 3.4 | 5.5 | $3,162.5 |
| Khanna, Abha | Senior Associate | $410 | 1/30/16 | 257.8 | 64.6 | 193.2 | $79,212 |
| Stafford, William | Senior Associate | $405 | 1/29/16 | 215.1 | 6.4 | 208.7 | $84,253.5 |
| Frost, Elisabeth C. | Senior Associate | $390 | 1/27/16 | 140.1 | 42.4 | 97.7 | $38,103 |
| Louijeune, Ruthzee | Junior Associate | $320 | 1/12/16 | 161.4 | 60.2 | 101.2 | $32,384 |
| Gonski, Sarah | Junior Associate | $310 | N/A | 12.3 | 1.7 | 10.6 | $3,286 |
| Marino, Patricia | Paralegal | $190 | N/A | 23.5 | 0 | 23.5 | $4,465 |
| TOTALS | | | | 1,316.5 | 251.7 | 1065.3 | $485,486 |

## 2. Adjustment for Unsuccessful or Unrelated Claims

■ The second step in calculating a reasonable fee requires us to "subtract fees for hours spent on unsuccessful claims unrelated to the successful ones." *McAfee*, 738 F.3d at 91 (internal quotation marks omitted). Plaintiffs brought one claim under 42 U.S.C. § 1983: that "Congressional District 3 violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution." Compl. ¶ 51. Plaintiffs were successful on that claim not once, but several times. Therefore, we leave the lodestar figure undisturbed and turn to the final step.

## 3. Adjustment for Degree of Success

■ In the third and final step, we "must consider the relationship between

25. In arriving at our reduction for time spent preparing for oral argument, we take into consideration the work done on the remedial portion of the litigation, to which neither Interveners nor Defendants object. Therefore, for each attorney, we calculate the appropriate reductions starting on the date on which they began working predominantly on oral argument preparations. We understand that applying reductions from these dates date may not target each and every entry related to oral argument. Indeed, it is difficult to define precisely what does and does not constitute "oral argument preparation." On the other hand, this approach may also reduce some legitimate entries for work performed in the remedial phase of the litigation or on separate merits issues. Nonetheless, our review of the billing records suggests that this formula will yield the smallest margin of error and will avoid unnecessarily complicated calculations.

the extent of success and the amount of the fee award." *McAfee,* 738 F.3d at 92 (internal quotation marks omitted). Specifically, we "ask ... whether the plaintiff achieved a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award." *Id.* (internal quotation marks and alteration omitted). As we concluded in our first memorandum opinion on fees, no reduction is warranted.

▆ Plaintiffs sought a declaratory judgment that "Congressional District 3 under the 2012 Congressional Plan is a racial gerrymander in violation of the Equal Protection Clause of the Fourteenth Amendment," and "a permanent injunction enjoining Defendants from enforcing or giving any effect to the boundaries of Congressional District 3 as drawn in the 2012 Congressional Plan, including an injunction barring Defendants from conducting any elections for the United States House of Representatives based on Congressional District 3." Compl. ¶ 10. We have now twice declared District 3 to be an unconstitutional racial gerrymander and our final decision stands following the Supreme Court's dismissal of Interveners' appeal. We have also twice enjoined Defendants from conducting elections under the 2012 districting plan and have implemented a remedial redistricting plan.[26]

▆ Plaintiffs' efforts in this litigation go beyond their own individual successes. "Deprivation of a fundamental right, such as limiting the right to vote in a manner that violates the Equal Protection Clause, constitutes irreparable injury." *Personhuballah,* 155 F.Supp.3d at 560 (quoting *Johnson v. Mortham,* 926 F.Supp. 1540, 1543 (N.D. Fla. 1996)). The injuries suffered by Plaintiffs were also injuries suffered by every voter in Virginia's Third

Congressional District. Because of Plaintiffs, voters in District 3 now cast their ballots under a constitutional districting scheme. With that in mind, we find that the results obtained by Plaintiffs are nothing less than excellent. "Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee." *Hensley,* 461 U.S. at 435, 103 S.Ct. 1933. Accordingly, Plaintiffs are entitled to the full combined attorney's fees award of $1,239,403.00.

### D. Costs and Expenses

Plaintiffs request $19,316.75 in litigation expenses in addition to the costs of $87,851.99 that we reinstated from the previous petitions. "[A] prevailing plaintiff is entitled to compensation for reasonable litigation expenses under § 1988." *Daly v. Hill,* 790 F.2d 1071, 1084 (4th Cir. 1986). Plaintiffs have submitted an itemized list, in addition to a supporting affidavit, of expenses, including photocopies and printing, discovery database hosting, shipping, travel and meals, research, and transcripts. Neither Defendants nor Intervenors raise any objection to the items included or the reasonableness of the amounts claimed. We therefore find Plaintiffs' claimed expenses are supported by the record, and we accordingly award Plaintiffs the full amount requested.

The additional costs and expenses will be allocated in the same proportions as the attorney's fees. Thus, Original Defendants are responsible for 14% of $19,316.75, or $2,704.35 and Intervenor–Defendants are responsible for the remaining $16,612.40.

### III. CONCLUSION

For the foregoing reasons, it is hereby:

---

**26.** As we earlier noted, the fact that we did not enjoin use of the plan during the 2014 election cycle does not render Plaintiffs' degree of success any less complete.

**ORDERED** that Plaintiffs' Fourth Supplemental Motion for Attorney's Fees is **GRANTED IN PART AND DENIED IN PART**. The Court awards Plaintiffs attorney's fees in the amount of $1,239,403.00 and costs in the amount of $107,168.74, for a grand total of $1,346,571.74.

Specifically, this total includes $691,337.40 in fees and $87,851.99 in costs from our previous order. This entire $779,189.39 award is assessed against Defendants. Of the Third Petition's award of $57,579.60, Defendants are liable for $16,122.29 in fees, and Intervenor–Defendants are liable for the remaining $41,457.31. Finally, for the Fourth Supplemental Petition, Defendants are liable for $68,668.04 in fees and $2,704.35 in costs. Intervenor–Defendants are responsible for the remaining $421,817.96 in fees and $16,612.40 in costs.

All told, this yields a total award of $866,684.07 against Defendants, and a total award of $479,887.67 against Intervenor–Defendants.

It is **SO ORDERED**.

PAYNE, Senior District Judge,
Concurring in Part, Dissenting in Part,

I agree with the quantum of fees and costs[27] awarded in the majority opinion as against the Defendants before they abandoned the defense of the redistricting statute at issue in this case. However, I do not agree that the Intervenor–Defendants are liable for any fees because, as explained below, I understand the Supreme Court's decision in Indep. Fed'n of Flight Attendants v. Zipes, 491 U.S. 754, 109 S.Ct. 2732, 105 L.Ed.2d 639 (1989) to foreclose such an award against the Intervenor–Defendants. Thus, I respectfully dissent from that part of the majority opinion.

**I.**

In Zipes, the Supreme Court announced that courts may impose fees against "blameless" intervenors "only where the intervenors' action was frivolous, unreasonable, or without foundation." Id. at 761, 109 S.Ct. 2732. In explaining its concept of "blameless," the Court made it clear that such intervenors will not be liable for fees because they have not violated anyone's civil rights. This distinction is made apparent at the outset by how the Court framed the issue to be decided:

> In this case we must determine under what circumstances [the fees statute] permits a court to award attorney's fees against intervenors *who have not been found to have violated the Civil Rights Act or any other federal law.*

Zipes, 491 U.S. at 755, 109 S.Ct. 2732 (emphasis added). In resolving that issue, the text of the decision then explains, with equal clarity, that liability for fees is dependent on merits liability. The Court says as much six times,[28] all in support of the threshold premise that "[o]ur cases have emphasized the crucial connection between liability for violation of federal law and liability' for attorney's fees under federal fee-shifting statutes." Zipes, 491 U.S. at 762, 109 S.Ct. 2732.

Like the intervenors in Zipes, the Intervenor–Defendants in this case have not violated anyone's civil rights or any other federal law. They have not been found liable on the merits of the underlying action, and they are in no way responsible

**27.** Under 42 U.S.C. § 1988(b) attorney's fees are "part of the costs." So, technically, an award of attorney's fees is part of the award of costs. However, the briefs, most of the cases, and the majority opinion use the terms "attorney's fees" or "fees" and so does this concurring and dissenting opinion.

**28.** See Zipes, 491 U.S. at 762–63, 109 S.Ct. 2732.

for the underlying constitutional violation—the decisive factor for fee liability according to Zipes. This makes the Intervenor–Defendants indistinguishable from those in Zipes, and, accordingly, they cannot be held liable for attorney's fees absent a finding that their intervention was "frivolous, unreasonable, or without foundation." Id. at 761, 109 S.Ct. 2732. In imposing fees without the requisite finding, the majority, I respectfully submit, misapprehends the holding in Zipes and misconstrues the precedent from other jurisdictions on which the award against the Intervenor–Defendants is based.

## II.

The majority correctly recognizes that the outcome of the motion for a fee award against the Intervenor–Defendants turns on whether Zipes applies in this case. Ante, at 935. However, in deciding that Zipes does not govern, the majority opinion proceeds from the erroneous assumption that the rule pronounced by Zipes is to be discerned from "four key factors in [the Zipes majority's] decision," ante, at 936, and then determines that "all of [those four factors are] distinguishable from the circumstances of this case." Ante, at 944. That analysis, I think, misapprehends what Zipes actually held.

The fundamental and animating principle enunciated in Zipes is that an intervenor's fee liability must run with liability on the merits. In framing the issue presented

and in the detailed explanation of its holding, the Supreme Court makes clear that merits liability, i.e. blameworthiness for the underlying civil rights violation, is the legal predicate for imposing liability under federal fee shifting statutes. The Court underscored that point by saying specifically that "[o]ur cases have emphasized the crucial connection between liability violation of federal law and liability for attorney's fees under federal fee shifting statutes." Zipes, 491 U.S. at 762, 109 S.Ct. 2732. Then, citing Kentucky v. Graham, 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985), the Court reiterated that "crucial connection" by endorsing its previous instructions that "liability on the merits and responsibility for fees go hand in hand," that "fee liability runs with merits liability," that "[f]ee and merits liability run together," and that "[s]ection 1988 simply does not create fee liability where merits liability is nonexistent." Id. (internal quotes omitted). That, as I see it, is the rule that Zipes tells us to apply.[29]

The majority opinion concludes that Zipes produced a quite different rule in the form of a four-factor test. That, I respectfully submit, misapprehends the actual holding of Zipes. And, the majority's view that "the "central fact" of Zipes" is "that the union intervened to protect distinct third-party interests," ante, at 939, is, I also submit, inaccurate. Indeed, the dissenters in Zipes faulted the Court for cre-

**29.** The majority believes this rule is "illogical," ante at 943, because it allows intervenors to "be eligible for fee awards, but rarely, if ever, liable for fees." To the contrary, intervenors will be liable for fees on the same terms as defendants—when they are held responsible on the merits for violating a plaintiffs civil rights. Similarly, intervenors will be eligible for fee awards only in the rare circumstances where they play the role of a civil rights plaintiff, i.e. when "the defendant-intervenor is the party vindicating rights guaran-

teed by the United States Constitution." King v. Illinois State Bd. of Elections. 410 F.3d 404, 423 (7th Cir. 2005). Like civil rights plaintiffs, the intervenors will also be liable for fees if their intervention is "frivolous, unreasonable, or without foundation." Zipes, 491 U.S. at 761, 109 S.Ct. 2732; see also Christiansburg Garment Co. v. Equal Employment Opportunity Comm'n, 434 U.S. 412, 421, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978) (announcing the same standard for the fee liability of civil rights plaintiffs).

ating a "categorical rule" based on wrongdoing, and for failing to account for the very same factors that the majority today describes as "key":

> Aside from its unpersuasive assertion that fee liability *must be conditioned on a finding of wrongdoing*, the majority never even attempts to explain why it adopts a *categorical rule* directing district courts to treat *all intervenors* like civil rights plaintiffs. Whatever validity such treatment might have where an intervenor raises a civil rights claim, there is absolutely no justification for it where, as in this case, an intervenor asserts non-civil-rights claims of third parties, or where an intervenor raises no third-party claims at all.

Zipes, 491 U.S. at 778, 109 S.Ct. 2732 (Marshall, J., dissenting). The dissent went on to observe, and correctly so, that the rule set by Zipes would apply equally to "parties [who] intervene for the sole purpose of defending the challenged practice or opposing the relief sought by the civil rights plaintiffs." Id..

Responding to the dissenters' concerns, the Zipes Court was unequivocal. Rejecting the "hostility to categorical rules ... supposedly enshrined in the [statutory] language," 491 U.S. at 760, 109 S.Ct. 2732, the Court responded, not by suggesting that its holding was narrow, but rather by pointing out that prior decisions had adopted rules "no less 'categorical' than the rule we set forth today." Id. at 761, 109 S.Ct. 2732. Moreover, while acknowledging that its broad rule could discourage some civil rights suits, the Court emphasized that an intervenor's culpability, or lack thereof, was simply the more important consideration:

> But even if the inability generally to recover fees against intervenors did create some marginal disincentive against Title VII suits, we would still have to weigh that against other considerations, as we did in Christiansburg Garment. *Foremost among these is the fact that, in contrast to losing Title VII defendants who are held presumptively liable for attorney's fees, losing intervenors like petitioner have not been found to have violated anyone's civil rights....* Awarding attorney's fees against such an intervenor would further neither the general policy that wrongdoers make whole those whom they have injured nor Title VII's aim of deterring employers from engaging in discriminatory practices.

Id. at 761–62, 109 S.Ct. 2732 (emphasis added).

The majority opinion responds to Zipes's focus on culpability for the underlying civil rights violation by finding that the Intervenor–Defendants here are not "blameless" as the term is used in Zipes. Ante, at 937, 939–41. But, that is not because the majority concludes that the Intervenor–Defendants have been found liable on the merits for violating federal law—the way the term is actually used in Zipes. Instead, the majority opinion bases blame on the fact that the Intervenor–Defendants became the Plaintiffs' "sole opposition," ante, at 940, and thus acted as "functional defendants." Ante, at 940–42. For that precept, the majority opinion quotes the Southern District of Florida for the argument that Intervenor–Defendants are blameworthy under Zipes because they "defended the unconstitutional statute voluntarily and in doing so attempted to aid in the offending statute's enforcement," Ante, at 940 (quoting Mallory v. Harkness, 923 F.Supp. 1546, 1553 (S.D. Fla. 1996), aff'd, 109 F.3d 771 (11th Cir. 1997)), I submit that Zipes expressly rejected that view, and that it is logically flawed.

As the Supreme Court held in Zipes, the concept of "blame" is synonymous with

responsibility for the underlying civil rights violation (*i.e.*, liability on the merits). It has nothing to do with "prolonging litigation" or being a "functional defendant," the test set out in the majority opinion today. Nor is it relevant that "the Intervenor–Defendants, as Plaintiffs' sole opposition, had the ability to grant Plaintiffs' relief on the merits by simply dropping its defense." *Ante*, at 940. Each of these alleged "distinctions" were present in Zipes, where the intervenors prolonged the litigation "as the Plaintiffs' sole opposition" for years, and could have granted the relief sought by the Plaintiffs and ended the case "by simply dropping its defense." Id. Nevertheless, the Supreme Court expressly disavowed these "distinctions" as important, much less controlling, factors. 491 U.S. at 765, 109 S.Ct. 2732 ("Intervention that is in good faith is by definition not a means of prolonging litigation."); see also id. ("Of course, an intervenor may sometimes raise an argument that brings into question not merely the appropriateness of the remedy but the plaintiffs very entitlement to relief ... [b]ut that an intervenor can advance the same argument as a defendant does not mean that the two must be treated alike for purposes of fee assessments.")

Still more problematic is the holding that a person affirmatively commits a civil rights violation, or somehow participates in some other underlying violation of federal law, by joining, and participating in, a lawsuit. *Ante*, at 940–42. That proposition, I think, is wrong. Although the decision to join a pending suit and to defend the statute at issue therein may be inadvisable in some circumstances, it does not *itself constitute* a violation of law. Moreover, if, as

the majority holds, the act of intervention and continuing to press one's case *ipso facto* makes an intervenor "culpable" for a violation of federal law, then the rule of Zipes collapses in on itself, and the very phrase "blameless intervenor" becomes a self-contradictory concept. This is neither a necessary nor a permissible reading of Zipes. Instead, it is evidence that the majority misconstrues the precedent on which it relies.

I do not read Mallory or Planned Parenthood of Cent. New Jersey v. Attorney Gen. of State of New Jersey, 297 F.3d 253 (3d Cir. 2002), to support the result reached today.[30] Nor do I think that either case supports the proposition that defending a statute makes one a violator of someone's civil rights. Instead, as I understand them, both cases stand for the common-sense principle that, where an unconstitutional statute is involved, the "blameworthy" party under Zipes is the state that enacted the statute.

Both Mallory and Planned Parenthood involved unconstitutional statutes, and in both cases the intervening party was a branch of the state government that had enacted the statute at issue. Mallory involved a law mandating that at least one member (of three) of the Florida Bar's Judicial Nominating Commission had to be either a woman or racial/ethnic minority. Mallory, 923 F.Supp. at 1550. The appointing body (the Florida Bar of Governors) was sued, but declined to defend the statute from the beginning. Id. The Attorney General, acting in his official capacity on behalf of the State of Florida, intervened to defend the constitutionality of the statute. Id. In Planned Parenthood, the state

---

**30.** The majority also cites Charles v. Daley, 846 F.2d 1057 (7th Cir, 1988), but that case pre-dates Zipes and consequently has not been followed even within the Seventh circuit. See, *e.g.*, Heald v. Granholm, 457 F.Supp.2d 790, 793 (E.D. Mich. 2006) ("[charles] predate[s] Zipes and must be disregarded on this basis alone ... Zipes is the controlling authority.")

legislature passed an abortion-related statute over executive veto. 297 F.3d at 259. The law was promptly challenged, and the enacting legislature immediately intervened after the executive branch had declined to defend the constitutionality of the statute. Id.

In both cases, fees were ultimately awarded against the intervenor-defendants: the States. Unlike the decision reached by the majority today, however, both of those decisions are consistent with the principle of Zipes (and Graham) that fee liability runs with a finding of culpability for the underlying civil rights violation. That is because, where an unconstitutional statute is involved, the "blameworthy" party is the State that enacted it. By enacting and enforcing an unconstitutional law, the State is the clear parallel to the "losing defendant who has committed a legal wrong" as explained in Zipes, 491 U.S. at 762, 109 S.Ct. 2732. And, when a statute is declared invalid, it is the State that has "been found to have violated [someone's] civil rights." Id. That, of course, is the fact pattern in both Mallory and Planned Parenthood. Consequently, when those courts imposed fee liability on the intervening state actors, they were imposing fees against the entity that was directly responsible for the constitutional violation. Therefore, both decisions fall well within the rule of Zipes requiring that merits and fee liability go hand in hand.

The majority sees this interpretation of Mallory and Planned Parenthood as creating a distinction based on the status of the intervenors as state actors. Ante, at 942. That argument misses the point. As explained above, Mallory and Planned Parenthood created no new rule of intervenor liability, much less one based on the status of the intervenor as a public entity. In-stead, both cases simply applied Zipes, which preconditions liability for fees on a finding that the intervenors are responsible on the merits for the underlying civil rights violation. Thus, the fact that the interveners in Mallory and Planned Parenthood were states merely explains how each court made that necessary finding: as representatives of the States that had enacted the unconstitutional statutes, the intervenors in both cases represented the actual entity responsible on the merits for the constitutional violations that had occurred. See Mallory, 923 F.Supp. at 1553 ("[T]he AG, acting as representative of the state, cannot be 'innocent' in terms of violating the Plaintiffs civil rights. The state enacted, enforced, and defended the unconstitutional statute."). Under Zipes, it was thus entirely proper to impose fees against them.

The majority also finds fault because the dissent "fails to acknowledge that both the original defendants and the intervenors in Mallory and Planned Parenthood were branches of state government." Ante, at 942 (emphasis in original). Respectfully, that aspect of Mallory and Planned Parenthood, while clearly true, only further cuts against the majority's analysis. In fact, it is that aspect of both cases—one that is also notably absent in the present ease—which justified the courts' decision to treat the original and intervening defendants as "functionally equivalent." Planned Parenthood, 297 F.3d at 264. To hold otherwise would have allowed the "loophole" discussed in Mallory and permitted the State to evade liability for fees despite being directly responsible for the underlying constitutional violation (a result contrary to Zipes). 923 F.Supp. at 1553. Such "functionalism" was further necessary in Planned Parenthood because the intervenors were asserting a defense of legislative

immunity.[31] 297 F.3d at 261–265.

Finally, the majority finds it important that the Intervenor–Defendants are members of Congress who were elected under the district as drawn. But again, the rule of Zipes does not turn on whether the intervening party is a private or public actor, but rather on whether the intervenor is responsible for the civil rights violation that occurred. Here, the Intervenor–Defendants do not represent "the Commonwealth of Virginia, whose laws ran afoul of the Federal Constitution." *Ante*, at 941. For fee liability purposes, that puts them in the same position as the union-intervenors in Zipes, who neither created nor enforced the discriminatory policy at issue but benefitted from its existence.[32] 491 U.S. at 757, 109 S.Ct. 2732. Most "crucial[ly]," id. at 762, 109 S.Ct. 2732, the Intervenor–Defendants here are analogous to the Zipes intervenors, and not the intervenors in Mallory or Planned Parenthood, because they are not, in any plausible way, responsible for "violat[ing] the Civil Rights Act or any other federal law." Zipes, 491 U.S. at 755, 109 S.Ct. 2732.

Although the majority resists this conclusion, they have not disputed the logic that produces it. The majority "agree[s] that, under Zipes, fee liability should lie with the party 'liable on the merits' for the boundaries of the Third Congressional District." *Ante*, at 941. Applying that rule, they then correctly conclude that "[h]ere, that is the Commonwealth of Virginia, whose laws ran afoul of the Federal Constitution." Id. Those two precepts necessarily lead to the conclusion that the Intervenor–Defendants, *who do not represent the Commonwealth of Virginia*, cannot be held liable for fees under Zipes. In concluding otherwise, the majority relies only on the theory that "as sole defenders of the Commonwealth's laws, Intervenor–Defendants assumed the risk of 'being liable on the merits' for the unconstitutional borders of the District." Id.

For the reasons already noted, that argument lacks merit. It conflicts with the facts of Zipes, and it makes the idea of "blameless intervenors" self-contradictory. More than that, however, it ignores the Supreme Court's ruling that the Intervenor–Defendants lacked standing to appeal the actual merits determination in this case. See Wittman v. Personhuballah, —— U.S. ——, 136 S.Ct. 1732, 1737, 195 L.Ed.2d37 (2016).[33] This begs the obvious

31. Although the majority seems to have overlooked it, legislative immunity' was the central, dispositive issue in Planned Parenthood, 297 F.3d at 261–265. Because the intervening legislature had "perform[ed] what is generally regarded as an executive function," and thereby served as the "functional defendant," the Third Circuit correctly held that they were not entitled to immunity from fees. See id. at 257 ("We conclude that, while legislators enjoy immunity for promulgating statutes, it makes little sense to provide them with this immunity when they step out of that role, as the New Jersey Legislature did here when it intervened to defend the constitutionality of the Act.")

32. While the Supreme Court ultimately held that the Intervenor–Defendants had not, for purposes of standing, sufficiently "identified record evidence establishing their alleged harm," Wittman v. Personhuballah, —— U.S. ——, 136 S.Ct. 1732, 1737, 195 L.Ed.2d 37 (2016), that does not change the "central fact". that they "litigated (and lost) not to avoid liability for violation of the law" but rather to protect their own interests. Zipes, 491 U.S. at 765, 109 S.Ct. 2732.

33. The Plaintiffs have not argued that the Intervenor–Defendants' lack of standing renders their intervention "frivolous," and for good reason. Their intervention was agreed to by the Plaintiffs, approved of by this panel, and continued even after the Supreme Court remanded the case. Indeed, we expressly held that the Intervenor–Defendants had standing. Thus, the Intervenor–Defendants' assertion of

question: how can the Intervenor–Defendants be "liable on the merits" if they lacked standing to appeal the actual merits decision in this case?

The answer, of course, is that they cannot. The Intervenor–Defendants neither created nor enforced the unconstitutional statute at issue in this case, and thus are not liable on the merits for its enactment. And, because the Intervenor–Defendants here are not responsible for any violation of federal law, they cannot be held liable for fees unless the Plaintiffs show that their intervention was "frivolous, unreasonable, or without foundation." Id. at 761, 109 S.Ct. 2732. The Plaintiffs have not made such a showing; indeed, they have not even made the argument. Thus, I would hold that the Intervenor–Defendants are not liable for any fees in this case, and that the Plaintiffs must bear their own cost for intervention-related expenses.[34]

## III.

In my view, the rule pronounced in Zipes governs all "intervenors who have not been found to have violated the Civil Rights Act or any other federal law." Id. at 755, 109 S.Ct. 2732. Although the majority may believe that rule is "illogical," ante, at 941, it is not empowered to overrule the binding precedent of the Supreme Court. Thus, although there may well be "various policy benefits," ante, at 944, to the majority's approach to intervenor fee liability, the law of Zipes still controls. The Supreme Court weighed the various advantages and disadvantages to its "categorical" approach when it decided Zipes, and it is for the Supreme Court to consider whether to revisit that decision. Unless and until it decides to do so, however, Zipes remains binding precedent on this Court, and it is our responsibility to apply it. Because I do not believe the majority opinion does so, I respectfully dissent from that part of the opinion that awards fees against the Intervenor–Defendants.

---

standing cannot plausibly be described as "frivolous, unreasonable, or without foundation." Zipes, 491 U.S. at 761, 109 S.Ct. 2732

**34.** Zipes instructs that the plaintiff bears his own costs for the portion of the case against "blameless" intervenors. 491 U.S. at 761, 109 S.Ct. 2732; see also Rum Creek Coal Sales. Inc. v. Caperton, 31 F.3d 169, 177 (4th Cir.

1994) ("[W]e nevertheless conclude that Zipes instructs us not to shift intervention-related expenses to the losing defendant."). Because fees incurred against "blameless intervenors" would not be shifted to the original defendants in this case (or any other), the suggestion by the majority that its holding protects taxpayers, ante, at 944–45, is also incorrect.